UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KEREL L. SEABROOKS,

    Petitioner,

        v.                         CAUSE NO. 3:18-CV-365-JD-MGG

WARDEN,

    Respondent.

OPINION AND ORDER

Kerel L. Seabrooks, a prisoner without a lawyer, filed a habeas petition under 28 U.S.C. § 2254 to challenge his convictions for felony murder in Case No. 71D03-102-CF-64. Following a jury trial, on January 9, 2003, the St. Joseph Superior Court sentenced Seabrooks to one hundred eighty years of incarceration.

FACTUAL BACKGROUND

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence presented at trial:

> On the afternoon of September 13, 2000, eighteen-year-old Charity Payne ("Payne") was lost and driving up and down Walnut Street in South Bend, Indiana. During this misadventure, Payne repeatedly passed the address of 1718 South Walnut. Seabrooks, Ronald Carter ("Carter"), Tyrome Wade ("Wade"), and Phillip Stroud ("Stroud"), who resided in the Detroit area but currently were visiting this address, noticed Payne repeatedly passing by. Eventually, Stroud ventured onto the street and initiated a conversation with Payne.

Payne, who had never met Stroud previously, nevertheless invited Stroud into her car and began to discuss her ex-boyfriend, John Sears. Although Payne described her breakup with John Sears as amicable at trial, Payne inexplicably informed Stroud of the Sears family's wealth, the extravagances contained in the Sears' home, how John Sears had circumvented the Sears' home-alarm system while they were dating, the schedule of the Sears' cleaning service, the layout of the Sears' home, the location of the Sears' dogs, and the address of the Sears' home.

Stroud and Payne then proceeded to pick up Wade. Even after noticing Stroud was carrying a handgun, Payne made sure Stroud and Wade would be able to locate the Sears' home by driving the two past it. Before Stroud departed Payne's company, he informed her that he intended to burglarize the Sears' home.

On the following morning, Stroud, Wade, Carter, and Seabrooks decided to burglarize the Sears' home. The group took an acquaintance's car and, after several wrong turns and stopping at a gas station to buy gloves, then drove to the Sears' home. The group noticed three trucks parked near the residence and heard a generator as they pulled up to the residence.

The Sears had hired the Arndt Construction Company to build a loft in a barn that was located on their property, and Lynn Ganger, Corby Myers, and Wayne Shumaker were working on the loft at the time of the group's arrival. Despite the indication that people might be at the Sears' residence, Wade proceeded to knock on the door and received no answer. One of the construction workers approached Wade and Stroud and asked what they were looking for. Wade informed the worker that they had seen an ad for the sale of a car and the worker responded by noting that he did not believe a car was for sale.

Wade and Stroud returned to their car. The car began to pull away, but after moving a very short distance, Stroud put the car in park and said, "We can't let the man get the license plates." Carter responded by noting, "Why not? We did nothing wrong." Despite Carter's assertion that they had nothing to worry about, Stroud insisted that the group go back and tie up the workers.

Stroud, Seabrooks, and Wade went into the barn, and Carter went around the barn to make sure no one else was there. When Carter stepped back into the barn, Wade was duct taping the workers' arms and legs behind their back, and Seabrooks was going through the wallet of one of the workers. Once the workers were face down on the ground, Stroud threw a

2

> shirt over one of the workers and shot him in the head. Subsequently, Stroud executed the remaining two workers.
>
> Stroud then noted that as long as they were there, they might as well go into the house and burglarize it. Seabrooks brought a ladder from the barn to the side of the Sears' house. Wade and Stroud climbed the ladder, entered the upstairs window and returned with a suitcase full of jewelry and foreign currency.
>
> After the group returned to South Bend, Seabrooks informed an acquaintance that he had burglarized a house and that Stroud had killed three people. Later that night, Seabrooks, Wade, and Carter returned to Detroit.
>
> On February 15, 2001, the State charged Seabrooks by information with three counts of felony murder and one count of Class A felony burglary. On December 11, 2002, a jury found Seabrooks guilty on all counts. The trial court merged Seabrooks' burglary conviction into his felony murder convictions and sentenced him to three consecutive sixty-year sentences to be served in the Department of Correction.

ECF 7-2 at 2-3; *State v. Seabrooks*, 803 N.E.2d 1190 (Ind. App. 2004).

On February 26, 2004, the Court of Appeals of Indiana affirmed the conviction on direct appeal, and Seabrooks did not file a petition to transfer the case to the Indiana Supreme Court. ECF 7-1. On July 3, 2006, Seabrooks filed a petition for post-conviction relief in the St. Joseph Superior Court. ECF 7-3. His petition for post-conviction relief was denied, and Seabrooks did not appeal. *Id.* On August 30, 2017, Seabrooks filed another petition for post-conviction relief, but the St. Joseph Superior Court dismissed it as an unauthorized successive petition. ECF 7-5.

On May 17, 2018, Seabrooks initiated this habeas case by filing a petition. ECF 1. In the petition, Seabrooks asserts that he is entitled to habeas relief because the prosecution failed to disclose that Ronald Carter, a key witness and codefendant, had

been threatened and bribed to testify against him (Ground 1). He also asserts that the prosecution failed to disclose information related to his interstate transfer from the custody of the State of Michigan to the State of Indiana for purposes of his trial -- specifically, the date of the request to transfer, which, in turn, concealed the prosecution's failure to comply with the timeliness requirements of the Interstate Detainer Act (Ground 2). He asserts that certain articles of evidence should have been excluded at trial based on the fruit of the poisonous tree doctrine (Ground 3). The Warden responds that these claims are untimely.

## TIMELINESS

The statute of limitations for habeas petitions states as follows:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

>   (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

The parties dispute whether subsection (B) or subsection (D) should apply to Seabrooks' claims. With respect to Ground 1, Seabrooks represents that he began speaking with Carter's spouse in December 2016 and that she did not deliver photographic evidence regarding Carter's motive for testifying against him until March 3, 2017.[1] The Warden argues that, even assuming that Seabrooks could not file a petition without photographic evidence,[2] Seabrooks did not file the habeas petition until more than one year later on May 17, 2018, so his petition would be untimely under subsection (D). In response, Seabrooks maintains that correctional staff placed him in administrative segregation shortly after he received the photographic evidence and that he had limited access to the law library, so subsection (B) should apply. He further maintains that these conditions persisted through the time he filed the petition in this case.

---

[1] Attached to the petition is a photograph that purportedly represents Carter in jail clothes with his family. ECF 1-3 at 33-34. Seabrooks contends that this photograph is relevant to his claims because physical contact is not allowed during jail visits and because the photograph of Carter making physical contact with his family suggests that Carter received special privileges in exchange for his testimony. ECF 1-2 at 6-7.

[2] Seabrooks maintains that he could not have filed the habeas petition when he became aware of the alleged bribery and threats but had to wait until he had evidence to support his claims within his possession. ECF 28 at 4, 8. However, the Federal Rules of Civil Procedure merely require that "factual contentions . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3).

According to the electronic dockets for federal and State courts in Indiana,[3] Seabrooks submitted the following filings between March 3, 2017, and May 17, 2018:

- On April 20, 2017, Seabrooks filed a civil complaint alleging that he was sexually assaulted and initiating *Seabrooks v. Stone*, 33C02-1704-CT-13 (Henry Cir. Ct.);

- On June 12, 2017, Seabrooks filed letter in *Seabrooks v. Stone*, 33C02-1704-CT-13 (Henry Cir. Ct. filed April 20, 2017);

- On July 7, 2017, Seabrooks filed a motion in *Seabrooks v. Stone*, 33C02-1704-CT-13 (Henry Cir. Ct. filed Apr. 20, 2017);

- On August 18, 2017, Seabrooks filed a motion in *Seabrooks v. Stone*, 33C02-1704-CT-13 (Henry Cir. Ct. filed Apr. 20, 2017).

- On August 27, 2017, Seabrooks filed two motions and discovery requests. *Seabrooks v. Stone*, 33C02-1704-CT-13 (Henry Cir. Ct. filed Apr. 20, 2017);

- On August 30, 2017, Seabrooks filed a petition for post-conviction relief and initiated *Seabrooks v. State*, 71D03-1708-PC-34 (St. Joseph Sup. Ct.);

- On October 17, 2017, Seabrooks filed motion to reconsider dismissal of post-conviction relief petition. *Seabrooks v. State*, 71D03-1708-PC-34 (St. Joseph Sup. Ct. filed Aug. 30, 2017);

- On October 23, 2017, Seabrooks filed a civil complaint alleging he was being held in long-term segregation without due process and initiating *Seabrooks v. Osburn*, 2:17-CV-490 (S.D. Ind.);

- On December 4, 2017, Seabrooks filed motion to reconsider denial of motion to reconsider dismissal of post-conviction relief petition. *Seabrooks v. State*, 71D03-1708-PC-34 (St. Joseph Sup. Ct. filed Aug. 30, 2017).

- On February 14, 2018, Seabrooks filed petition for successive post-conviction relief with Court of Appeals of Indiana and initiated *Seabrooks v. State*, 18A-SP-400 (Ind. Ct. App.).;

---

[3] In accordance with Fed. R. Evid. 201, the court takes judicial notice of the proceedings in the federal and State courts in Indiana.

6

- On March 20, 2018, Seabrooks wrote to Court of Appeals of Indiana about his petition for successive post-conviction relief. *Seabrooks v. State*, 18A-SP-400 (Ind. Ct. App. filed Feb. 14, 2018);

- On March 22, 2018, Seabrooks wrote to Indiana Supreme Court about his pending petition for successive post-conviction relief. ECF 1-3 at 61;

- On April 17, 2018, Seabrooks filed a motion in *Seabrooks v. Osburn*, 2:17-CV-490 (S.D. Ind. filed Oct. 23, 2017);

- On May 17, 2018, Seabrooks filed the habeas petition that initiated this case. ECF 1.

In other words, during the relevant time, Seabrooks submitted filings on at least thirteen occasions with five different courts and initiated civil proceedings for four separate cases. These filings included filings related to his conviction for murder and filings in federal court. Based on this filing history, it appears that the State of Indiana did not create an impediment that prevented Seabrooks from initiating this case in 2017 and in 2018. *See Conroy v. Thompson*, 929 F.3d 818, 821 (7th Cir. 2019) (finding that the petitioner could not demonstrate that he was prevented from pursuing federal habeas claims because he had filed numerous documents in State court); *Ramirez v. Yates*, 571 F.3d 993, 998 (9th Cir. 2009) (finding that the petitioner could not demonstrate that he was unable to prepare a federal habeas petition because he had filed other well-researched documents with various courts and "offer[ed] no explanation of how or why his restricted library access made it impossible for him to file a timely § 2254 petition but not . . . other substantial legal filings.").

Here, the court pauses to consider its authority to make a finding at this stage of the proceedings on whether Section 2244(d)(1)(B) applies to this case rather than

proceeding to an evidentiary hearing. Rule 8(a) of the Rules Governing Section 2254 Cases offers the following guidance:

> If the petition is not dismissed, the judge must review the answer, any transcripts, and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted.

In other words, the court must make the determination on whether to hold an evidentiary hearing after reviewing the record once the case is fully briefed. While these rules do not articulate a standard for this determination, they incorporate the Federal Rules of Civil Procedure "to the extent that they are not inconsistent with any statutory provisions of these rules." Rule 12 of the Rules Governing Section 2254 Cases. The Federal Rules of Civil Procedure include two primary mechanisms to resolve disputes related to timeliness short of holding an evidentiary hearing. *See Indep. Tr. Corp. v. Stewart Info. Services Corp.*, 665 F.3d 930, 935 (7th Cir. 2012) (timeliness may be resolved under Fed. R. Civ. P. 12(b)(6)); *Gieringer v. Silverman*, 731 F.2d 1272, 1277 (7th Cir. 1984) (timeliness may be resolved under Fed. R. Civ. P. 56).

First, Fed. R. Civ. P. 12(b)(6) authorizes courts to dismiss for failure to state a claim upon which relief can be granted. Under this rule, courts must construe the factual allegations in the light most favorable to the plaintiff and determine whether they would entitle the plaintiff to the requested relief and, relatedly, whether it is necessary to consider any evidentiary support for these allegations. *Cole v. U.S. Capital*, 389 F.3d 719, 724 (7th Cir. 2004); *Marshall-Mosby v. Corp. Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000). Next, Fed. R. Civ. P. 56 authorizes courts to dispose of claims

8

through summary judgment. Under this rule, the court may grant judgment as a matter of law if a party has "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). For such determinations, the governing standard is whether a reasonable factfinder could rule in favor of a party based on the evidentiary record. *Johnson v. Advoc. Health and Hosps. Corp.*, 892 F.3d 887, 893–94 (7th Cir. 2018). Based on the foregoing, the court is satisfied of its authority to make a finding on whether Section 2244(d)(1)(B) applies to this case without an evidentiary hearing when that finding is made consistent with Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56. *See e.g., Wood v. Spencer*, 487 F.3d 1 (1st Cir. 2007) (affirming the district court's finding, without proceeding to a hearing, that 28 U.S.C. § 2244(d)(1)(B) did not apply); *Maclin v. Robinson*, 74 Fed. Appx. 587 (6th Cir. 2003) (same); *Lloyd v. Van Natta*, 296 F.3d 630 (7th Cir. 2002) (same).

  Here, even construing the record in the light most favorable to Seabrooks, the large number of filings submitted during the relevant time period, many of which related to the same issues raised in the petition initiating this case, persuades the court that no reasonable factfinder could find that limited access to the law library prevented Seabrooks from filing a habeas petition in a timelier fashion. Consequently, the court finds that that the State of Indiana did not create an impediment that prevented Seabrooks from initiating this case in 2017 and in 2018 and that Section 2244(d)(1)(B) does not apply. Consequently, Section 2244(d)(1)(D) is the applicable provision for Ground 1. Seabrooks concedes that he was aware of the factual predicate for Ground 1

9

by March 3, 2017. ECF 28 at 4-5. Because he filed his habeas petition more than one year after that date, the court finds that Ground 1 is untimely.

Similar reasoning applies to both Ground 2 and Ground 3. With respect to Ground 2, Seabrooks became aware of the factual predicate as early as January 13, 2004, when he wrote his counsel on direct appeal about his concerns regarding his interstate transfer. ECF 27-1 at 191. In Ground 3, Seabrooks relies on a decision from the Court of Appeals of Indiana issued on August 31, 2006, to argue that, because that court held that the prosecution introduced Charity Payne's custodial statements in violation of her rights under *Miranda v. Arizona*, 284 U.S. 436 (1960), evidence obtained during the ensuing search of the 1718 Walnut residence should have been excluded from his trial under the fruit of the poisonous tree doctrine. It is unclear why Seabrooks could not have discovered this publicly available decision in Payne's closely related case in 2006 or why he could not have discerned the *Miranda* violation even sooner from the filings in Payne's case with the lower court. Nevertheless, the court will accept Seabrooks' assertion that he could not have discovered the *Miranda* violation until the summer of 2009 even with due diligence.

According to the electronic dockets for federal and State courts, Seabrooks initiated three proceedings since 2009 in addition to those mentioned above: *Seabrooks v. State*, 71A05-1410-SP-506 (Ind. Ct. App. Jan. 2, 2014); *Seabrooks v. Butts*, 1:13-cv-600 (S.D. Ind. filed Apr. 9, 2013); *Seabrooks v. State*, 71A03-1107-SP-315 (Ind. App. Ct. filed July 18, 2011). Many of Seabrooks' filings in these cases are typed, lengthy, and detailed with appropriate citations to the record and legal authority and numerous exhibits attached.

10

ECF 27-4; ECF 27-5; ECF 27-6; ECF 27-7. Consequently, the court finds that no State-created impediment prevented Seabrooks from filing Ground 2 and Ground 3 as habeas claims by at least July 18, 2011 -- the date he filed *Seabrooks v. State*, 71A03-1107-SP-315 with the Court of Appeals of Indiana. Because he did not do so within one year of that date, the court finds that Ground 2 and Ground 3 are untimely.

Seabrooks argues that the court should excuse the untimely nature of this petition under the doctrine of equitable tolling. He argues that his inability to obtain evidence to support his claim regarding Carter's testimony until March 2017 and his reliance on faulty and outdated legal material from the law library indicating that the proper course for obtaining relief was to file a successive petition with the State courts amount to extraordinary circumstances preventing him from filing a timely habeas petition. "[A] petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010). Petitioners must show reasonable diligence in pursuing their rights throughout the federal limitations period and until the date the habeas petition is filed. *Carpenter v. Douma*, 840 F.3d 867, 870 (7th Cir. 2016). Whether to apply equitable tolling to a particular case is a matter for the court's discretion. *Mayberry v. Dittmann*, 904 F.3d 525, 530 (7th Cir. 2018); *Obriecht v. Foster*, 727 F.3d 744, 748 (7th Cir. 2013).

The limitations period for Seabrooks' claims first began to accrue at the conclusion of direct review in 2004. Though the record reflects that Seabrooks has diligently pursued his claims at times, it does not reflect that he did so continuously

11

until the date he filed the habeas petition in this case. And, as detailed above, no extraordinary circumstances prevented Seabrooks from filing detailed petitions for post-conviction relief in State court in July 2011, January 2014, August 2017, and February 2018. Seabrooks may have believed that pursuing relief in State court was the better course based on legal material requested from the prison law library, including Sections 2 and 3 of Rule 1 of the Indiana Rules of Post-Conviction Remedies as amended in 2015, but Seabrooks does not explain why he believes this legal material was faulty or outdated. ECF 11-1 at 8; ECF 28 at 9. To the contrary, the Indiana Rules of Post-Conviction Remedies were not amended again until 2019, so Seabrooks did not rely on outdated rules when he decided to pursue successive petitions for post-conviction relief in State court in 2017 and 2018. Ind. R. Post-Conviction Remedies, Historical Notes. Further, Seabrooks does not explain how the presence of outdated legal materials in a law library constitutes an extraordinary circumstance.[4] Consequently, Seabrooks has not demonstrated that his reliance on legal material provided by the law library at his request constitutes an extraordinary circumstance that prevented him from filing a timely habeas petition.

Seabrooks also asserts that actual innocence excuses the untimely nature of his habeas claims. A habeas petitioner can overcome untimeliness by establishing that the

---

[4] Indeed, the issue of whether judicial opinions, statutes, or rules remain good law may present thorny legal issues that even the most skilled law librarians could not resolve on their own. *See e.g.*, *Wyeth v. Levine*, 555 U.S. 555 (2009) (whether federal statutory law preempts State common law); *U.S. v. Stivers*, 996 F.3d 800 (7th Cir. 2021) (whether statutory law supersedes court rules); *Planned Parenthood of Indiana and Kentucky, Inc. v. Box*, 991 F.3d 740 (7th Cir. 2021) (whether the Supreme Court of the United States overruled itself).

court's refusal to consider an untimely claim would result in a fundamental miscarriage of justice. *McQuiggin v. Perkins*, 569 U.S. 383, 394 (2013). To meet this exception, the petitioner must establish that "a constitutional violation has resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 536–37 (2006). "Such new evidence can take the form of any new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Gladney v. Pollard*, 799 F.3d 889, 896 (7th Cir. 2015). "The reviewing court then considers the total record—all the evidence, old and new, incriminatory and exculpatory—and makes a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* "It is not the role of the court to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.*

Seabrooks offers the affidavit of Ronald Carter as new evidence, which states as follows:

> 2. I was arrested in Detroit, Michigan on or about the 15th of May 2001 on an outstanding warrant in connection with a triple murder in Saint Joseph County Indiana (Lakeville). I arrived in Saint Joseph County on or about the 16 June 2001, where I was formally charged with three counts of felony murder, three counts of robbery, and one count of burglary.
>
> 3. During my time at the St. Joseph County Jail, I was visited several times by Special Crimes Commander Michael Swanson. On at least three separate occasions Commander Swanson provided me with cocaine and

13

> marijuana, which he got from bags marked evidence. During that time he would show me photographs of the Lakeville triple murder scene. At which time he would give me details from the case that I would otherwise have no knowledge of.
>
> 4. The testimony I gave at the trials of Tyrome Wade, Kerel Seabrooks, and Phillip Stroud was the information that Commander Swanson provided me. Commander Swanson took me to the Lakeville crime scene prior to my filmed walk through to ensure that I could describe the events the way he had instructed me to. It is my sworn statement that any and all trial and deposition testimony that I gave was false. Commander Swanson threatened me with capital punishment if I refused to implicate Tyrome Wade, Kerel Seabrooks and Phillip Stroud. Commander Swanson informed me that the prosecutor's office did NOT want me to testify at Charity Payne's trial. Commander Swanson stated that if I testified at her trial, my plea agreement would be removed. I did NOT testify at Charity Payne's trial as instructed by Commander Swanson.

ECF 1-3 at 23-24.

After reviewing the trial record, the court observes that Ronald Carter was an important witness for the prosecution, providing a more complete sequence of events for the burglary and murders than the prosecution could have otherwise presented. Trial Tr. 636-85. However, the prosecution presented a substantial amount of other evidence showing Seabrooks' involvement in the events surrounding the murders, including: (1) Robert Washington's testimony that Seabrooks' told him that he was present as Phillip Stroud shot the construction workers; (2) Seabrooks' statement during a police interview that he knew who was involved with the murders; (3) DNA analysis tying Seabrooks to a shoe found at the South Bend residence where Seabrooks had visited and footprint analysis tying that shoe to construction site where the murders occurred; and (4) video surveillance recording of Seabrooks and Carter purchasing gloves at the gas station earlier in the day of the murders and fingerprint analysis tying

14

Seabrooks to the sales tag for these gloves found in the car used to commit the murders. *Id.* at 303-19, 471-72, 559-61, 591-99, 606-09; Trial Ex. 73; Trial Ex. 114 at 2.

Moreover, Carter's affidavit presents substantial credibility issues. Notably, at trial, the prosecution represented that Carter refused to testify against Charity Payne because his mother had received threats from Seabrooks. Trial Tr. 726-28. The refusal to testify violated the terms of his plea agreement and resulted in its termination. *Id.* This sequence of events raises questions regarding Carter's motive for preparing the affidavit, particularly in light of the electronic dockets indicating that he never presented this information to the St. Joseph Superior Court or the federal courts in Indiana to invalidate his own convictions for felony murder. These events also undermine Carter's attestation that Commander Swanson threatened that his plea agreement would be revoked if he testified at Charity Payne's trial given that the plea agreement was revoked because he refused to testify against her.

Further, Carter testified that he went into a gas station and purchased gloves with Seabrooks and Tyrome Wade earlier on the day of the murders. Trial Tr. 653-58. As a result, the video surveillance recording corroborating this testimony undermines Carter's attestation that "any and all trial and deposition testimony that [he] gave was false." Additionally, Carter's trial testimony was detailed, consistent both internally and with other evidence, and withstood scrutiny on cross-examination. It also included a disagreement with the prosecution's theory regarding the positioning of the victims' bodies, which demonstrated a willingness to deviate from the prosecutions' narrative when it conflicted with his personal recollection. *Id.* at 673-74. And Carter offered

15

similar testimony in several other proceedings; he eventually pled guilty to felony murder, which necessarily entailed his admission that he committed the crime, and, as Carter concedes, he also testified at the trials of Tyrome Wade and Phillip Stroud. *Id.* at 709-10, 719

In sum, the court finds that Seabrooks has failed to establish that, in light of the information contained in Carter's affidavit, no reasonable juror would have found petitioner guilty beyond a reasonable doubt. Because Seabrooks has not demonstrated a valid basis to excuse the untimely nature of his claims, the court denies the habeas petition.

## CERTIFICATE OF APPEALABILITY

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must consider whether to grant or deny a certificate of appealability. To obtain a certificate of appealability when the court dismisses a petition on procedural grounds, the petitioner must show that reasonable jurists would find it debatable (1) whether the court was correct in its procedural ruling and (2) whether the petition states a valid claim for denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, there is no basis for finding that jurists of reason would debate the correctness of this procedural ruling, so there is no basis for encouraging Seabrooks to proceed further in federal court.

For these reasons, the court:

(1) DISMISSES the petition (ECF 1) because the claims are untimely;

(2) DENIES Kerel L. Seabrooks, a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and

(3) DIRECTS the clerk to close this case.

SO ORDERED on July 23, 2021

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT